THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CHRISTOPHER HENEHAN and | : | |
| LORI HENEHAN | : | |
| Plaintiffs, | : | 3:22-CV-466 |
| | : | (JUDGE MARIANI) |
| v. | : | |
| | : | |
| AMCO INSURANCE COMPANY | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM OPINION

Presently before the Court is a motion for summary judgment filed by Defendant AMCO Insurance Company ("Defendant" or "AMCO"). (Doc. 39). For the reasons that follow, AMCO's motion will be granted.

## I.    INTRODUCTION AND PROCEDURAL HISTORY

Plaintiffs Christopher and Lori Henehan ("Plaintiffs") initiated this action via Writ of Summons filed on November 5, 2021, in the Court of Common Pleas of Lackawanna County. (Doc. 1-2). Plaintiffs commenced this action against Defendants the City of Scranton, Penn Anthracite Colliers Co ("Penn"), and AMCO, bringing both federal and state law claims. (*Id.*). Plaintiffs filed their initial complaint in state court on or about February 28, 2022. (Doc. 1-3). Defendant AMCO timely removed the action to this Court pursuant to 28 U.S.C. § 1441(a) because Plaintiffs initial complaint raised questions under federal law. (Doc. 1).

On May 10, 2022, Plaintiffs filed a First Amended Complaint, which is the operative pleading in this action. (Doc. 17). The First Amended Complaint no longer identifies the City of Scranton as a defendant and therefore Plaintiffs did not purse any federal claims as of May 10, 2022. (*Id.*). The only remaining defendants are Defendant Penn and Defendant AMCO. (*Id.*). Specifically, Plaintiffs brought state law claims of statutory bad faith, breach of contract, and a violation of Pennsylvania's Unfair Trade Practices and Consumer Protection Law ("UTPCPL") against Defendant AMCO. (Doc 17 at 4-6). Plaintiffs also brought a negligence claim against Defendant Penn. (*Id.* at 6-7).

On May 24, 2022, Defendant AMCO filed a motion to dismiss. (Doc. 18). The Court referred the matter to Magistrate Judge Carlson who recommended this Court grant AMCO's motion to dismiss Counts I and III alleging statutory bad faith and violation of the UTPCPL without prejudice and with leave to amend. (Doc. 26). Plaintiffs did not file any objections and the Court adopted Magistrate Judge Carlson's Report and Recommendation in full. (Doc. 27). Plaintiffs did not file a second amended complaint. Accordingly, the only remaining claims are a breach of contract claim against Defendant AMCO and a negligence claim against Defendant Penn. On August 24, 2023, Defendant AMCO filed an Answer as well as a crossclaim against co-Defendant Penn.[1] (Doc. 28).

---

[1]    Although Plaintiffs filed an Affidavit of Service on July 15, 2022, (Docs. 22-23), Plaintiffs appear to have taken no action to prosecute this action against Defendant Penn since that date. *See* (Doc. 40, ¶ 12) ("It is not clear if Penn still exists as an entity, as service of original process has never been confirmed and no attorney has entered on their behalf."). Accordingly, on July 1, 2025, the Court issued an Order directing Plaintiffs to show cause why their negligence claim against Penn should not be dismissed for failure to

On December 31, 2024, Defendant AMCO filed a motion for summary judgment, (Doc. 39), along with a Statement of Material Facts. (Doc. 40) ("DSOMF"). Plaintiffs filed a brief in opposition, (Doc. 47), and a response to AMCO's Statement of Material Facts ("PSOMF"). (Doc. 47-1).[2] AMCO filed a reply brief, (Doc. 50), and the matter is ripe for disposition.

## II.    STATEMENT OF UNDISPUTED MATERIAL FACTS

The following facts are undisputed, unless otherwise noted:

This is a civil action originally filed in the Court of Common Pleas of Lackawanna County, Pennsylvania, Docket No. 2021-04789. A time-stamped copy of the Writ of summons is attached hereto as Exhibit A. (DSOMF, ¶ 1); (Def. Ex. A.). Plaintiffs Christopher and Lori Henehan initiated this action via Writ of Summons filed on November 5, 2021. (Id.). Plaintiffs subsequently filed a complaint in state court on or about February 28, 2022, naming the City of Scranton, Penn, and AMCO as defendants. (DSOMF, ¶ 3); (Def. Ex. A.).[3] In the original complaint, Plaintiffs alleged that "Plaintiffs' residence

---

prosecute. (Doc. 51). On July 3, 2025, the Court approved a stipulation by Plaintiffs and AMCO dismissing Penn from this action. (Doc. 54).

[2]    Plaintiff also filed a document entitled "Plaintiff's Statement of Material & Disputed Facts." (Doc. 47). This filing does not comply with Local Rule 56.1 or the Court's Scheduling Order. (Doc. 34 at 2 n.1). Although the Court considered this document and the referenced exhibits in deciding this motion, the actual response to Defendant's Statement of Material Facts is (Doc. 47-1), which, unlike (Doc. 47), contains admissions and denials in response to DSOMF.

[3]    Throughout their response to AMCO Statement of Materials Facts, Plaintiffs denied certain statements on the basis that the document referenced or the docket in this matter "speaks for itself." (PSOMF, ¶ 3-5, 9-13, 17, 31, 33-34). For these statements which Plaintiffs denies because the document "speaks for itself," the Court will quote the relevant portions of the document at issue.

experienced damage including a subsidence of their basement wall as well a flood, leading

to the residence being condemned.  Upon information and belief, Plaintiff's residence was

damaged by the neighbor's tree damaging Plaintiff's gutters, but Defendant, City of

Scranton, dismissed this belief and insisted that the collapse of the basement wall was

based on gutter issues, without acknowledging any issues done to gutter by the neighbor

trees."[4]  (Doc. 1-3, ¶ 6).  Plaintiff also alleged that "[t]wo of the water pipes on the neighbor's

property that have caused damage to Plaintiffs foundation are still in place today.  However,

Defendant [AMCO] has never accepted any of Plaintiffs' claim or provided any financial

protection."  (*Id.*, ¶ 17).

In Paragraphs 13-14 of the original complaint, Plaintiffs alleged that water running in

the basement caused their front and left wall to collapse.  (DSOMF, ¶ 4); (Def. Ex. B).

Specifically, Plaintiffs alleged that "[i]n March 2018, a portion of the front basement wall on

Plaintiffs residence collapsed from water running down from the opposite side of the house."

(Doc. 1-3, ¶ 13).  And they further alleged that "[f]ollowing the front wall collapse, the left

wall of the basement collapsed.  After this collapse, Plaintiffs had engineer come to address

---

[4]      Plaintiffs further alleged that their "neighbor had flexible hoses with downspouts pointed at the
foundation of Plaintiffs' residence, and Defendant, City of Scranton, agreed that it was not right for the
neighbor to have that setup."  (Doc. 1-3, ¶ 7).  Plaintiffs also alleged that that the "City of Scranton determined
that this was a trespass by the neighbors on Plaintiffs' property pursuant to the Storm Water Management
Act."  (*Id.*, ¶ 8).  Plaintiff further alleged that they reached out to the City of Scranton "for assistance on
multiple occasions from 2017 until the conviction [sic] of Plaintiff's residence in 2018 but were told that there
was no department that could help them with the situation.  Additionally, Defendant, City of Scranton never
attempted to communicate with or provide any notice to Plaintiffs regarding the condemnation of the
residence."  (*Id.*, ¶10).

the situation. The engineer determined that the right side of the basement, which was still

intact at this time, was sinking more than the left wall that just collapsed due to a sinkhole

on the right side of the basement." (*Id.*, ¶ 14). Plaintiffs further alleged that in the "summer

of 2017, Plaintiffs filed an insurance claim with Defendant [AMCO] that was eventually

denied. Plaintiffs believe the claim was denied because their insurance did not cover water

damage coming in below the foundation, and that water is considered an Act of God." (*Id.*,

¶ 12).

Defendant AMCO issued a policy of insurance to Christopher and Lori Henehan,

bearing policy number HOM 0059046979-1 (the "Policy"), providing certain coverage at 734

Theodore Street, Scranton, PA 18503-1743 (the "Property"), as more fully set forth in the

copy of the policy with endorsements. (DSOMF, ¶ 6); (Def. Ex. C). The Policy was in place

from May 18, 2017, through May 18, 2018.[5] (Doc. 39-3 at 7). The Policy contains the

following provision:

> G. Suit Against Us
>
> No action can be brought unless there has been full compliance with all of the terms
> under Section I of this policy and the action is started within one year after the date of
> loss.

(*Id.*); (Def. Ex. C at Conditions, Condition G at p. 16 of 26). Plaintiffs initiated this action via

Writ of Summons filed on November 5, 2021, four years after the date of loss reported to

---

[5]    It is unclear if the Policy was renewed, as neither Plaintiffs nor Defendant raised this issue, and the
only Policy before this Court ended on May 18, 2018. (Doc. 39-3); (Doc. 47-2).

Defendant AMCO, July 28, 2017.  (DSOMF, ¶ 8).  In the initial complaint, Plaintiffs also

sued Defendant Penn.  (*Id.*, ¶ 9).  They alleged that Penn "operates multiple mining shafts

in Scranton, Pennsylvania.  One of the shafts owned by [Penn] runs directly under the

Plaintiffs' residence.  Along with the water damage and collapsed foundation caused by the

neighbor's trees and downspouts, poor mining mechanics, tunnel structure, and overall

maintenance by [Penn], are factors that contributed to the development of a sinkhole in

Plaintiff's residence."  (Doc. 1-3, ¶ 18).

On March 29, 2022, AMCO timely filed a Notice of Removal pursuant to 28 U.S.C. §

1441(a).  (DSOMF, ¶ 10).  Both AMCO and the City of Scranton filed motions to dismiss the

complaint on or about April 5, 2022.  (*Id.*, ¶ 11); (Doc. 10-11).  On May 10, 2022, Plaintiffs

filed an Amended Complaint.  (DSOMF, ¶ 12); (Doc. 17).  The First Amended Complaint did

not include the City of Scranton as a Defendant.  (*Id.*).  The First Amended Complaint

includes similar statements of damage causation as included in the original complaint.

(DSOMF, ¶ 13); (Doc. 17, ¶¶ 7-17, 19-20).  Specifically, Plaintiffs alleged in the First

Amended Complaint (which is the operative pleading) that their damages "were caused by

the known water infiltration from Plaintiffs' neighbors' home and/or in the alternative by the

hole underneath Plaintiff's home, which was caused by [Penn]."  (Doc. 17, ¶ 18).  The First

Amended Complaint alleged three causes of action against Defendant AMCO:  Statutory

Bad Faith in Count I, Breach of Contract in Count II, and violation of the UTPCPL in Count

III. (DSOMF, ¶ 14). On May 24, 2022, Defendant AMCO filed a Motion to Dismiss Counts I and III of the First Amended Complaint. (*Id.*, ¶ 15).

On July 28, 2023, this Court adopted Magistrate Judge Carlson's Report and Recommendation, dismissing Counts I and III of the First Amended Complaint without prejudice, with leave to amend. (*Id.*, ¶ 16). Plaintiffs were given fourteen days to file a second amended complaint, but no second amended complaint was filed. (*Id.*). Following the parties' stipulation to dismissal of Defendant Penn, (Doc. 54), the only remaining claim left in this litigation is Count II of the First Amended Complaint alleging Breach of Contract under the Policy by Defendant AMCO. (*Id.*, ¶ 17).

Plaintiffs had years of ongoing and continuous problems with subservice [sic] water leaking into their basement and causing flooding, mold, and decay. (DSOMF, ¶ 18).[6] They first reported their subservice [sic] water issues to Erie Insurance in 2016. (*Id.*); (Def. Ex. D). On January 15, 2016, Plaintiff Christopher Henehan called Erie Insurance to report water entering the Property, 734 Theodore Street, Scranton, PA 18508, causing mold and erosion. (DSOMF, ¶18); (Def. Ex. E). Mr. Henehan reported that water was coming into the basement from the left-hand side of the home, causing mold and erosion. (*Id.*). He further reported to the Erie adjuster:

Q:  Okay, and where's the water actually coming from as far as you can tell?

---

[6]    Although Plaintiffs denied this statement, they did not provide any reference to the record evidence in violation of Local Rule 56.1. *See* L.R. 56.1 ("Statements of material facts in support of, or in opposition to, a motion shall include references to the parts of the record that support the statements."). This fact will be deemed admitted.

A:  Uh, from where I can tell it's coming from the front end to approximately 15 foot down the house from the outside of the home due to a pine tree uh, very close to my property that the water's dumping off the um, branches and the pine needles and developing a, a pond like uh, situation outside the foundation.  Then the water runs into the founday [sic], into the, in through the foundation and you can watch it run down the foundation in, tt [sic], into the floor, and I have dug, I've trenched to try to mm, um, control the water running through the whole basement to keep it insolated to one area, and then I take it out in five-gallon pails, roughly uh, on a good rain, roughly 300 gallons at a time.

(*Id.*); (Def. Ex. E at 1).  This water flowing below the surface had been seeping into their

basement for years, though the problem increased in the second half of 2015.  (DSOMF, ¶

19); (Def. Ex. E. at 1).[7]  Mr. Henehan and the Erie adjuster had the following transcribed

conversation:

Q: Okay, has anything changed lately to make it worse that you notice or?

A: No, um, (clears throat).  Uh, well, it, it might've changed because of the fact that the posts were rotten from water coming in.

Q: Mhm.

A:  The main, the main lally columns that hold up the main beam of the home, so what I did was I dug, refooted and got two new lally columns in there, and from where I dug back, um, then I realized that the water was running underneath, which was only um, probably an inch of concrete uh, that was generally on top of um, the floor of the basement.

Q: Mhm.

A:  And until I popped that concrete up, I didn't realize that the water was running underneath it (overlapping speech) so I never really saw it because it was not going

---

[7]    Although Plaintiffs denied this statement, they did not provide any reference to the record evidence in violation of Local Rule 56.1.  *See* L.R. 56.1 ("Statements of material facts in support of, or in opposition to, a motion shall include references to the parts of the record that support the statements.").  This fact will be deemed admitted.

over the top of it, it was going underneath it until I popped up, popped it up, and then realized that it was running a lot more than I knew it that I knew.

Q:  Kinda had a, a, a, ss, a flow of water underneath the concrete that was covered by the concrete?

A:  Yeah.  That I wasn't (overlapping speech) aware of until, you know…

Q:  Makes sense.

A:  … and, until I popped it up to uh put the new lally columns in and due to the, the old wooden ones being rotted on the bottoms.

Q:  Mhm.

A:  Then once I figured that out that they were rotted on the bottoms, I'm thinking well, how could this be and one thing led into another, doing a little investigating, and, and, troubleshooting, and found out that the water that was running down the walls was eroding and running underneath the concrete, and actually uh, causing the concrete to fall.

Q:  Oh, okay.

(DSOMF, ¶ 20); (Def. Ex. E at 1-2).

On June 19, 2024, Plaintiff Christopher Henehan testified under oath that, prior to reporting the current claim to Defendant AMCO on or about July 31, 2017, he could not recall if he previously made a homeowner's insurance claim concerning water damage and mold in the basement of the Property.  (DSOMF, ¶ 21); (Def. Ex. L); (PSOMF, ¶ 21).  Mr. Henehan further testified that he refooted and installed new basement lally columns no more than three months before reporting the current claim to Defendant AMCO.  (*Id.*).  This deposition occurred prior to Erie Insurance providing their files, and Mr. Henehan was confronted with an ISO report that contained brief summaries of each prior insurance claim.

(DSOMF, ¶ 21); (Def. Ex. N.).  On this ISO summary there were two potential prior

homeowners water damage claims, one from December 10, 2010 with the note, "LEAK

FROM 2ND FLOOR BA", and one from January 13, 2016 with the note, "WATER DAMAGE

AND MOLD IN." (*Id.*).  Both claims referenced Plaintiffs prior insurer, Erie Insurance.  (*Id.*).

When asked about these claims in his deposition, Mr. Henehan testified as follows:

> Q:  I'll just ask you, have you made any other home insurance claims before?
>
> A:  Yes.
>
> Q:  All right.  Was that at the Theodore Street property?
>
> A:  Yes.
>
> Q:  What other homeowners' claim did you make?
>
> A:  A pipe broke in an upstairs bathroom, which in return flooded my kitchen.
>
> Q:   Was that with Nationwide of your previous insurer?
>
> A:  I don't know.  My wife would know more.
>
> Q:  Do you know about how long ago that was?
>
> A:  I don't recall.
>
> Q:  And then were there any other claims made?
>
> A:  I don't recall.
>
> Q:   Do you know if that leaking pipe there was a—do you know if that claim was resolved?
>
> A:  Yeah.  We had to hire a contractor to do the majority of the work.
>
> Q:  But it didn't lead to any lawsuit or anything like that?

A:  No.

Q:  Do you know if there was a separate instance involving water damage and mold in additional to that leaking bathroom?

A:  I think there was something that—something happened, but it wasn't a big thing. Something happened and I can't remember.  But there was—something else happened—something else got leaked somewhere.  But I can't recall.  It wasn't something that caused major damage.

Q:  I'm just showing you another water damage claim in 2016.  So, about a year before this incident was reported to Nationwide.  You don't remember where that would have been?

A:  Well, was—I believe it had something to do with the same bathroom.  I can't recall what actually happened.

Q:  Okay.  So it didn't involve the basement.

A:  No.

Q:  So then tell me about the Theodore Street property.  Could you just describe it? Do you know how old it is?

A:  Late 1800s.

(DSOMF, ¶ 22); (Def. Ex. L at 16-18).

Lori Henehan reported that she did not remember much about 2016, though she did

not believe they had reported a basement water damage homeowner's claim.  When

confronted with the ISO report, she testified:

A:  I have no idea what it says.  It says Lori Henehan, 734 Theodore Street.  On January 13 of 2016 Erie Insurance Exchange and it gives a claim number, ending in 9911. It says it's homeowners and then it says water damage and mold and then cuts off.  That does not ring a bell to me whatsoever.

Q:  Have you made any other homeowners' claim in relation to the basement?

A:  Not in—no.  I mean not that I can---not that I could recall.

Q:  Okay.

A:  I don't think anything happened in 2016.

Q:  All right.

A:  I'm trying to think what the heck?  I don't even—where was I in 2016?

Q:  So as far as you can remember, the first time you reported any water issues in your basement was in 2017 to Nationwide?

A:  Like I said, I went down the basement very, very little.  I had absolutely no reason to be down there.  2016?  Where the heck was I in 2016?

Q:  Is it possible that that was a claim related to the basement water damage?

A:  I don't think so, no.

(DSOMF, ¶ 23); (Def. Ex. M at 40-41).

On January 25, 2016, Plaintiffs prior insurance company, Erie Insurance, denied their claim, citing the policy exclusions against coverage for flood and water below the surface of the ground and any water which flows, seeps or leaks into any part of the building.  (DSOMF, ¶ 24); (Def. Ex. D).  Plaintiffs then purchased the Policy from Defendant AMCO, which became effective on May 18, 2017.  (DSOMF, ¶ 25); (Def. Ex. C, Declaration p.1).  The Policy contains certain exclusions related to water seeping into the foundation below the surface, for tree root damage, for sinkholes and earth movement, and for mold and rot.  (DSOMF, ¶ 26); (PSOMF, ¶ 26) ("Admitted in part and denied in part.  Admitted as

to the text of policy. Denied as to Defendant's interpretation of the policy.). Specifically, the

Policy provides:

> **A**. We do not insure for loss caused directly or indirectly by any of the following. Such loss is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss. These exclusions apply whether or not the loss event results in widespread damage or affects a substantial area.

> > **2. Earth Movement**
> > Earth Movement means:
> > > **a.** Earthquake, including land shock waves or tremors before, during or after a volcanic eruption;
> > > **b.** Landslide, mudslide, or mudflow;
> > > **c.** Subsidence or sinkhole; or
> > > **d.** Any other earth movement including earth sinking, rising or shifting; caused by or resulting from human or animal forces or any act of nature unless direct loss by fire or explosion ensues and then we will pay only for the damage caused by the ensuing cause of loss.

> > **3. Water Damage**
> > Water Damage Means:
> > > **a.** Flood, surface water, waves, tidal water, overflow of a body of water, or spray from any of these, whether or not driven by wind;
> > > **b.** Water or water-borne material which backs up through sewers or drains or which overflows or is discharged from a sump, sump pump or related equipment; or
> > > **c.** Water or water-borne material below the surface of the ground, including water which exerts pressure on or seeps or leaks through a building, sidewalk, driveway, foundation, swimming pool or other structure; caused by or resulting from human or animal forces or nature.

(DSOMF, ¶ 26); (Def. Ex. C at Section I Exclusions at Exclusion A.2. and A.3 at p. 13 of 26).

In Section I of the Policy, Perils Insured Against, the Policy defines what is covered

before listing the following exclusions from coverage:

> **2.** We do not insure, however, for loss:

**a**. Excluded under **SECTION I - EXCLUSIONS**

**b**. Involving collapse, other than as Provided in **E.8.** under **SECTION 1 –
PROPERTY COVERAGES**;

**c**. Caused by:

    **6.** Any of the following:

        **a)** Wear and tear, marring, deterioration;

        **b)** Mechanical breakdown, latent defect, inherent vice, or any
quality in property that causes it to damage or destroy itself;

        **c)** Smog, rust or other corrosion, fungi, fungus, mold, wet or dry
rot; . . .

        **f)** Settling, shrinking, bulging or expansion, including resultant
cracking, of bulkheads, pavement, patios, footings, foundations,
walls, floors, roofs or ceilings; . . .

        **h)** Tree, shrub, or bush roots.

(DSOMF, ¶ 26); (Def. Ex. C at Section I, Perils Insured Against with Exceptions at 9-11 of

26).

Under Section II Conditions, the Policy provides, in part: "All 'bodily injury' and

'property damage' resulting from any one accident or from continuous or repeated exposure

to substantially the same general harmful conditions shall be considered to be the result of

one 'occurrence.'" (DSOMF, ¶ 26); (Def. Ex. C at Section II Conditions at Condition A at 23

of 26, Definitions, Definition 8 at 2 of 26). "**8.** Under Section **II** 'Occurrence' means an

accident, including continuous or repeated exposure to substantially the same general

harmful conditions, which results, during the policy period, in: **a.** 'Bodily injury; or **b.**

"Property Damage." (Def. Ex. C at 11). "**9.** Under Section **II**, 'Property damage' means

physical injury to, destruction of, or loss of use of tangible property." (*Id.*).

On or about July 30, 2017, Plaintiffs reported a claim to Defendant, emphasizing that

their neighbors' tree roots had entered their basement foundation "causing water and mold

issues." (DSOMF, ¶ 27); (Def. Ex. F at 22-24). On a follow up call, Ms. Henehan gave

more details of their claimed damages, reporting to the adjuster:

> [O]ver several years insured has had tree roots coming in through the foundation and water ion [sic] the unfinished basement. The tree roots come from several large pine trees in neighbors [sic] yard. Also she stated that her gutters have come down on that side of the house, water from the roof has pooled up next to the foundation and water seeps through the foundation after rains. Mold and mushrooms are growing in the basement from the moisture problem. Mr. [Henehan] has also been digging out the basement floor to pour a new one and about 1/3 of it is dirt and clay, where the water comes in.

(DSOMF, ¶ 27); (Def. Ex. F at 22).

After the investigation, the claim was denied on August 9, 2017, due to, *inter alia*,

the policy exclusions on coverage for damage caused by water seeping below the surface

of the ground, tree roots, mold and rot, and settling, bulging and cracking of foundations or

walls. (DSOMF, ¶ 28); (Def. Ex. G). The denial letter, (Def. Ex. G), lists the date of loss

provided by Plaintiffs as July 28, 2017. (*Id.*). This is the only date of loss that has ever

been associated with the claim and this date of loss was never contested by Plaintiffs. (*Id.*).

Plaintiffs did not contest the denial or bring suit until at least November 2021. (DSOMF, ¶

29); (PSOMF, ¶ 29).[8]

On or about August 21, 2020, Ms. Henehan reported to AMCO that they had not

been able to reside in the home since the loss, that the foundation collapsed, and they

---

[8]    Plaintiffs denied this statement of fact "as stated." (PSOMF, ¶ 29). However, that is not a proper response, as set forth in the Case Management Order. (*See* Doc. 34 at 2 n.1) ("**No response by the non-moving party to movant's statement of material fact which purports to be a denial of an asserted statement of material that uses the term "denied as stated" is permitted**.) (emphasis in original). This fact will be deemed admitted.

learned about a mine beneath their home. (DSOMF, ¶ 29); (Def. Ex. F).  Mr. Henehan also contacted AMCO and stated that he had been pursuing the entities he believed were responsible for their collapsing foundation.  (Id).  He explained that he and Ms. Henehan hired an attorney to seek compensation from the neighbors for diverting rainwater towards their foundation.  (Id.).  He further described his efforts to prove that the foundation subsistence was caused by mining in the area, as a nearby home had suffered foundational failure due to earth movement caused by mining.  (Id.).  Plaintiff Lori Henehan described the basement as turning into quicksand covered in slime with mushrooms growing in it. (DSOMF, ¶ 30); (Def. Ex. M at 24-25).  Plaintiffs had received confirmation from the Department of Environmental Protection District Mining Operations that two mine shafts ran below their property, with one being approximately sixty feet below the surface.  (DSOMF, ¶ 31); (Def. Ex. H).[9]

Plaintiffs also reported to AMCO that in October of 2018 they had hired their own engineer to inspect the property and to report on the exact causes of the earth movement which was bulging and breaking their foundation.  (DSOMF ¶ 32); (Def. Ex. I).  This report was shared with Defendants nearly two years after it was created, on or about September 4, 2020.  (DSOMF, ¶ 32); (Def. Ex. F).  Plaintiffs' engineering report was based of a site inspection performed on October 22, 2018, and is dated October 24, 2018.  (Def. Ex. I, Doc.

---

[9]      Plaintiffs deny this statement of facts "as stated" and further state that the "exhibit speaks for itself." (PSOMF, ¶ 31).

39-9). The engineering report by Eric J. Speicher, PE of Labella Associates reached the

following conclusion and attached photographs of the damage:

## Conclusions

Based upon the observations noted during the subject inspection, it is the opinion of this report that the damage to the subject residence was likely caused by several contributing factors. As stated previously, sometime between October 10, 2018 and October 22, 2018, a portion of the front stone foundation wall of the subject residence had collapsed. As noted, the foundation debris was lying in the basement, as well as a large amount of the aggregate base fill from the front porch on-grade concrete slab. The remaining areas of the front left and front right portions of the foundation wall appear to be undermined due to loss of material. As reported to the author, water would enter the basement area during rainfall events and portions of the foundation wall had areas of previous root growth around and through the foundation.

As reported to the author, water would infiltrate into the basement area of the subject residence during rainfall events. The subject residence currently does not have a gutter installed along the left side upper roof eave. As reported to the author, this section of rain gutter had fallen from the subject residence two separate times in the past. As stated, the gutter had become clogged with needles from the adjacent western property's pine trees that overhung the subject residence. During rainfall events, water will fall freely from the left side of the subject residence to the ground below along the left side of the foundation. As stated previously, the western neighbor's rain leaders are or were directed toward and discharge onto the surface adjacent to the subject residence's left foundation wall during rainfall events. Therefore, during rainfall events, these two factors will allow a large amount of water run-off to be directed toward and pool around the subject residence's left foundation wall. This condition will result in a large horizontal surcharge pressure to be placed against the foundation wall, which could lead to translation and bowing evident today. As also reported to the author, water entering the subject residence's basement would enter a subsurface depression/hole at the front right of the basement. This migration of water through the basement could carry fines and material from the basement area and would lead to undermining of the cinder/ash slab and the foundation wall as evident today. Also, as water migrated out through the depression/hole at the front right of the subject residence, this migration likely carried fines and materials with it, causing continued undermining and loss of bearing material of the foundation.

As shown in pictures provided to the author by the owner, there were several areas in the basement where root systems could be seen protruding through and under the subject residence's foundation wall. As previously noted, there were several large pine trees surrounding the western neighbor's residence in close proximity to the subject residence. This root system has the ability to grow in, around and under the foundation wall and into the subject residence basement. This condition could cause additional lateral pressure against the foundation wall leading to translation and bowing evident today. The continued growth of the root system could also cause cracking of the mortar joints in the foundation wall, leading to additional infiltration areas for groundwater.

As previously stated, there is an existing timber column founded on a concrete footing that supports the center support beam of the subject residence. This timber column is out of plumb and is leaning toward the right foundation wall by approximately 3 or 4 inches out of vertical. This timber column is toe-nailed in to the timber support column at the top. Therefore, the magnitude of the out of vertical of the column could be a fairly good indicator of the magnitude of translation and bowing of the foundation wall. With the typical rigid connectivity of the floor joists with the sill plate and rim board for this type of construction, any movement of the foundation wall would reflect in longitudinal movement of the transverse floor joists. Since the timber column is nailed to the support beam at the top but free to rotate at its bottom interface with the concrete footing, the 3 to 4 inch magnitude of the out of vertical of the timber support column could indicate a nearly equal magnitude of movement and bulging of the left foundation wall.

As previously stated, the front porch of the subject residence was reconstructed c. 2014. As per street view pictures from Google Earth (dated May 2012), the previously existing front porch on the subject residence consisted of what appears to be a block perimeter wall, timber board deck, and concrete steps. The front porch as inspected consists of a poured foundation footing, masonry block wall and pillars with a cultured stone façade, and a concrete slab on grade with vinyl railings around the perimeter. During this reconstruction, a cultured stone façade was also added to the front of the house in the porch area. Based on standard construction practice, the previously existing porch likely had a crawlspace beneath the timber deck boards. The existing porch has a poured concrete slab. This concrete slab would have required the area beneath to be backfilled prior to concrete placement. As stated previously, the collapsed portion of the foundation wall in the basement has rock debris that is consistent with concrete slab backfill. The addition of this backfill beneath the concrete porch slab would have put an additional lateral load on the front of the subject residence foundation wall. This additional surcharge, in addition to the undermining of

the existing foundation wall and loss of bearing material could have led to the damage evident today.

It is the author's opinion that the residence is in an unstable condition and should not be inhabited until repairs are made. Until the aforementioned contributing factors are mitigated and repaired, the damage to the residence will continue. Also, with the upcoming winter months and imminent freeze/thaw cycles of the ground, this damage could likely be accelerated.

The observations noted and the findings presented in this report are based on the information available to the author at the time of the inspection and subsequent information provided by the owner. If additional information becomes available, our office reserves the right to examine and interpret the new information and modify any of our conclusions and recommendations, as required. If there are any questions regarding this report, or if additional information is required, please feel free to contact our office.

(DSOMF, ¶ 33); (Def. Ex. I at 2-4).[10]

On September 4, 2020, based in part on the findings of Plaintiffs' own engineering report, Defendant AMCO issued a letter reaffirming the initial denial of coverage. (DSOMF, ¶ 34); (Def. Ex. J). This letter affirmed the initial denial, listed the Policy exclusions, and explained that the denial of coverage from August 9, 2017, was unchanged. (*Id.*). This letter listed the date of loss provided by Plaintiffs, July 28, 2017, which is the only date of loss given, and has never been challenged by Plaintiffs. (*Id.*). The September 4, 2020, letter from Defendant AMCO described and/or copied Plaintiffs' engineer's report, listing the exclusion in the policy against earth movement, including subsistence, sinkhole or other

---

[10]    Plaintiffs deny the statement because the "exhibit speaks for itself. By way of further answer, the report explicitly states that the gutters, trees, and neighbor's pipes had been removed by the time of LaBella's inspection." (PSOMF, ¶ 33).

shifting, whether caused by man-made actions or acts of nature. (DSOMF, ¶ 35); (Def. Ex. J).[11] The September 4, 2020, letter further listed the Policy exclusions on coverage for damage caused by water below the surface of the ground, which seeps, leaks, or flow through a building, foundation or other structure. (*Id.*). The letter included the policy exclusions against coverage for damage caused by collapse, abrupt falling down or caving in, loss of structural integrity and bulging, leaning, or settling caused by wear and tear and deterioration, bulging or expansion of the foundation, and root growth, movement or action. (*Id.*). Defendant's expert engineering reviewed all documents and concluded, in agreement with Plaintiffs' expert, that the foundation collapse was the product of ongoing erosion made worse by tree root growth and rainwater diversions. (DSOMF, ¶ 36); (Def. Ex. O).[12]

Plaintiffs have not lived at the Property since January of 2018, and on May 14, 2021, the City of Scranton condemned the property, deeming it an unsafe structure due to the crumbling foundation. (DSOMF, ¶ 37); (Def. Ex. K at 1); (Def. Ex. L at 63). Plaintiffs subsequently initiated this lawsuit on November 5, 2021. (DSOMF, ¶ 38); (Def. Ex. A).

---

[11]    Plaintiffs denied this statement of fact but fails to cite any record evidence in violation of Local Rule 56.1. (PSOMF, ¶ 35). They further state that "upon information and belief, no independent thought was employed in drafting the 2020 denial. There is no point by point explanation. Defendant copied the pasted the policy and copied and pasted the opinion from the Labella report." Although the Court notes Plaintiffs' arguments, this is not a proper denial under Local Rule 56.1 and will be deemed admitted.

[12]    Plaintiffs denied this statement of fact because "[s]aid averment is a conclusion of law to which no response is required." (PSOMF, ¶ 36). The Court includes only those statements which are not conclusions of law when describing (DSOMF, ¶ 36).

## III.     STANDARD OF REVIEW

Summary judgment "is appropriate only where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Gonzalez v. AMR*, 549 F.3d 219, 223 (3d Cir. 2008).  "An issue is genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party, and a factual dispute is material only if it might affect the outcome of the suit under governing law." *Kaucher v. Cnty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).  Thus, through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact."  Fed. R. Civ. P. 56(a).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).  Once such a showing has been made, the non-moving party must offer specific facts contradicting those averred by the movant to establish a genuine issue of material fact.  *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990).  Therefore, the non-moving party may not oppose summary judgment simply on the basis of the pleadings, or on conclusory statements that a factual issue exists.  *Anderson*, 477 U.S. at 248.  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record . . . or showing that the materials cited do not establish the absence or presence of a

genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)-(B).  In evaluating whether summary judgment should be granted, "[t]he court need consider only the cited materials, but it may consider other materials in the record."  Fed. R. Civ. P. 56(c)(3).  "Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true."  *Big Apple BMW, Inc. v. BMW of N. Am., Inc.,* 974 F.2d 1358, 1363 (3d Cir. 1992), *cert. denied* 507 U.S. 912, 113 S.Ct. 1262, 122 L.Ed.2d 659 (1993).

However, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts."  *Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007).  If a party has carried its burden under the summary judgment rule,

> its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.  The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact. When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

*Id.* (internal quotations, citations, and alterations omitted).  "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of evidence."  *Anderson*, 477 U.S. at 255.  Therefore, when evidentiary facts

are in dispute, when the credibility of witnesses may be in issue, or when conflicting

evidence must be weighed, a full trial is usually necessary.

## IV.    ANALYSIS

AMCO moves for summary judgment on Plaintiffs' breach of contract claim.[13]  (Doc.

39).  Plaintiffs oppose Defendant's motion.  (Doc. 47).  AMCO first argues that Plaintiffs'

breach of contract claim is time-barred by the Policy's one-year contractual suit limitations

provision ("Contractual Limitations Provision").  (Doc. 39 at 24-28).  AMCO further assets

that, even if not time-barred, Plaintiffs' breach of contract claim fails because AMCO made

its coverage decision pursuant to a valid policy exclusion.  (*Id.* at 29-34).

### A.    **Plaintiffs' Admit Their Suit is Time-Barred, Absent Waiver**

Defendant AMCO seeks summary judgment claiming the one-year Contractual

Limitations Provision in the Policy bars Plaintiffs' claim.  This provision provides:   "G.  Suit

Against Us.  No action can be brought unless there has been full compliance with all of the

terms under Section I of this policy and the action is started within one year after the date of

loss."  (DSOMF, ¶ 6); (Def. Ex. C at 25).  Plaintiffs do not dispute that the one-year

---

[13]      The Court has jurisdiction over this diversity action pursuant to 28 U.S.C. § 1332 because Plaintiffs
are citizens of Pennsylvania and Defendant is a citizen of Iowa and the amount in controversy is over
$75,000.  This case was initially removed under 28 U.S.C. § 1441(a) due to Plaintiffs raising several
constitutional claims under 42 U.S.C. § 1983 against the City of Scranton, but those claims are no longer
alleged in this action.  The parties, and the Court, appear to agree that Pennsylvania law applies to this
action.  *See Canal Ins. Co. v. Underwriters at Lloyd's London,* 435 F.3d 431, 434 (3d Cir. 2006) ("Under
Pennsylvania choice-of-law rules, an insurance contract is governed by the law of the state in which the
contract was made.") (citations omitted).

Contractual Limitations Provision applies to their breach of contract claim, nor do they claim

that this provision is ambiguous. (Doc. 47 at 7-10). Rather, their only argument regarding

the one-year Contractual Limitations Period is that Defendant AMCO waived the

Contractual Limitations Provision. (*Id.*). Specifically, Plaintiffs entire argument regarding

the one-year Contractual Limitation Period is as follows:

### B. Defendant waived the contractual statute of limitations.

Our Courts have upheld contractual statute of limitations clauses. *Gen. State Auth. v. Planet Ins. Co.*, 346 A.2d 265, 166-66 [sic] (1975). However, a contractual limitation period can be extended or waived where the actions of the insurer lead the insured to believe the provision will not be enforced. *Id.* at n.6; *Jones v. Harleysville Mut. Ins. Co.*, 900 A.2d 855, 857 (Pa. Super. 2006).

Here, on July 31, 2017, Plaintiffs reported a loss to Defendant. Ex. B. On or about August 9, 2017, Defendant denied Plaintiffs' claim. Ex. C. In or around January 2018, Plaintiffs moved out of the property. *See*, Ex. I, L.H. Depo at 22:18-24, 23:1-9; Ex J, C.H. Depo at 63:17-24. As the conditions of the basement continued to change, Plaintiffs retained an engineer, LaBella Associates, to assess the situation. *See*, Ex. D. At some point thereafter, Plaintiffs learned that there was a mine beneath their property. *See* Ex. E. On or about August 31, 2020, following the changes to the condition of the property, Plaintiffs contacted Defendant. *See* Ex. B.

Defendant's agent updated the 2017 claim. *Id.* Defendant's agent incorporated the report from LaBella Associates into the 2017 claim. *Id.* And on September 4, 2020, Defendant issued a letter to Plaintiffs incorporating the LaBella report and affirming the denial. *Id.*; Ex. F.

This similarly occurred again on April 1, 2021, when Defendant via Mr. Davies received new information from Mr. Henehan. Ex. B. Mr. Davies told Mr. Henehan that given the information provided, the denial would still apply.

Defendant repeatedly reopened the same claim. It is not clear from the facts that based on the changes to the condition of the property and new information learned and proffered by Plaintiffs that everything Plaintiffs experienced regarding the basement should have been treated as one occurrence. Plaintiffs are not insurance

agents or adjusters. Even if Plaintiffs' contacted Defendant in reference to the 2017 claim, it was a choice by Defendant to reopen the 2017 claim instead of opening a new claim based on new damage and potential causes.

Defendant did not merely review the prior denial of the claim, but incorporated all the new information and changes Plaintiffs proffered and issued subsequent denials. *See* Exs. B and F. The LaBella report, which Defendant incorporated, reflected that at least three of the prior putative causes of damages, the gutters and neighbor's trees and storm damage, had been remediated or removed, and despite that, Plaintiffs' foundation collapsed. *See* Ex. D. Such is conduct by Defendant that would lead Plaintiffs to believe that the statute of limitation period would not be followed.

Defendant's argument regarding Plaintiffs' 2016 claim to Erie is irrelevant. From July 31, 2017, until litigation, Defendant accepted the reported loss date of July 28, 2017. *See* Exs. B, C, F. Defendants' evidence does not reflect what Erie determined was the cause of the damage, only that it was ultimately denied as water damage. *See* ECF 39-4; ECF 39-5. In Mr. Henehan's conversation with Erie, he states that he believes it is flooding at the foundation caused by tree runoff and pine needles. *See* ECF 39-5 at 2. But Mr. Henehan is not an expert. And that is distinctly different from the putative causes raised in the 2017 claim, which included, *inter alia,* gutters, lack of gutters, tree roots, storm drainage, subsurface mine, etc. Thus, it is an issue of material fact as to whether Plaintiffs' date of loss is in January 2016 or July 2017. At this point, the Erie claim is merely evidence that Defendant failed to exercise due diligence in investigating the 2017 claim in 2017.

Given the foregoing, Defendant waived the contractual statute of limitations period. Defendant's Motion should be denied.

(*Id.* at 7-10).

AMCO disputes that it waived the one-year Contractual Limitations Provision. (Doc. 50 at 1-5). Specifically, it claims that "Plaintiffs appear to allege that Defendant somehow waived the suit limitations period in the Policy by considering Plaintiffs' provisions of additional details and information on their claim, as was appropriate for Defendant to do, and then consistently re-iterating the claim denial." (*Id.* at 1). "Following Plaintiffs' logic, it

appears Defendant only could have avoided waiver by ignoring Plaintiffs' provision of additional information on the claim. Had Defendant done so, Plaintiffs no doubt would have claimed that such conduct breached the insurance policy contract. To the contrary, Defendant gave Plaintiffs' supplemental submissions due consideration, but consistently and properly maintained the denial." (*Id.* at 2).

"Insurance policies are contracts, and the rules of contract interpretation provide that the mutual intention of the parties at the time they formed the contract govern its interpretation." *Am. & Foreign Ins. Co. v. Jerry's Sports Ctr., Inc.*, 606 Pa. 584, 2 A.3d 526, 540 (2010) (citations omitted). "Under Pennsylvania law, contract actions are subject to a four (4) year statute of limitations." *Pratts v. State Farm Fire & Cas. Co.*, 2019 WL 1952875, at *5 (M.D. Pa. May 2, 2019) (citations omitted). "The insurance contract at issue, however, provides for a shorter time to file suit." *Id.* "Such contractual provisions shortening the period for an insured to file a claim are permissible under Pennsylvania law." *Id.* (collecting cases); *see also Gen. State Auth. v. Planet Ins. Co.*, 464 Pa. 162, 165, 346 A.2d 265, 267 (1975) ("The law is clear that such a clause, setting time limits upon the commence of suit to recover on a policy, is valid and will be sustained."); *Prime Medica Assoc. v. Valley Forge Ins. Co.*, 970 A.2d 1149, 1156 (Pa. Super. 2009) ("Pennsylvania law recognizes as valid suit limitations clauses in insurance policies.").

"One-year suit limitations provisions—such as the one at issue in this case—have repeatedly been found to be reasonable under Pennsylvania law." *Houtz v. State Farm Fire*

*& Cas. Co.*, 754 F. Supp. 3d. 594, 597 (E.D. Pa. 2024) (collecting cases). "The limitation period runs from the date of the occurrence of the destructive event or casualty insured against." *Warren v. State Farm Fire & Cas. Co.*, 2024 WL 3201663, at \*3 (E.D. Pa. June 26, 2024) (citation and quotation marks omitted); *see also Long v. Farmers New Century Ins. Co.*, 267 F. Supp. 3d 530, 535 (E.D. Pa. 2017) ("A policy's limitations period begins to run from the date of the occurrence of the destructive event insured against.").

It is undisputed that Defendant AMCO denied Plaintiffs' claim on August 9, 2017. (Doc. 39-7 at 1). In the denial letter, Defendant explained the reasons for its denial and further stated "[i]f you have information about this claim that may affect our current decision—please forward it to us as soon as possible." (*Id.* at 2). The letter further provided at the top of the first page and at the bottom of the second page the following language: "Suit Against Us. No action can be brought unless there has been full compliance with all of the terms under Section I of this policy and the action is started within one year after the date of loss." (*Id.* at 1-2). The date of loss is identified as July 28, 2017. (*Id.* at 1). Moreover, the August 9, 2017, denial letter contained the following language: "We expressly reserve all other rights, defenses, of contentions, which are available to us under the policy of insurance, by law or otherwise, and do not waive any such rights or defenses which we now have or which may become known to us in the future." (*Id.* at 2).

Over three years after the initial denial letter, on or about August 31, 2020, Plaintiffs submitted additional information to Defendant, including an expert report by Labella

Associates. (Doc. 39-9). The report is dated October 24, 2018, but was not submitted to AMCO for nearly two years. (*Id.*). On September 4, 2020, Defendant AMCO sent a new letter to Plaintiffs. (Doc. 39-10). The letter is dated September 4, 2020, and affirms the previous 2017 denial and referenced many of the same exclusions in the initial denial letter. (*Id.*). This letter also incorporated the Labella Report and added additional bases for denial of the initial claim.[14] (*Id.* at 1-4). The letter further provides: "Please be advised that your policy contains the following provision: Suit Against Us. No action can be brought unless there has been full compliance with all of the terms under Section I of this policy and the action is started within one year after the date of loss." (*Id.* at 3). The date of loss is again identified as July 28, 2017, and Plaintiffs never challenged the date of loss.[15] (*Id.* at 1).

It is AMCO's burden on summary judgment to show the absence of genuine material factual dispute as to its affirmative defense of the one-year Contractual Limitations Provision. Viewing the facts and inferences from those fact in the light most favorable to

---

[14]    The initial denial letter of August 9, 2017, denied coverage due to exclusions against water damage, wet and dry rot, settling, shrinking, bulging, or expansion, including cracking of ... foundations, and well as tree shrub or bush roots. (Doc. 39-7). The September 4, 2020, letter reaffirming the denial cites those same exclusions, and includes additional bases for denial including, among others, the Policy's exclusion against earth movement. (Doc. 30-10).

[15]    Arguably, Plaintiffs date of loss could have occurred in 2016—prior to purchasing the Policy from AMCO. (Docs. 39-5, 36-6). The Court merely notes this, and whether the loss occurred 2016 or 2017 is not material in resolving this motion. The Court, and the parties agree the date of loss is July 28, 2017. (DSOMF, ¶ 7) (date of loss July 28, 2017); (Doc. 47 at 9-10) (Plaintiff's opposition brief stating that date of loss should be considered July 2017, or at least there "is an issue of material fact as to whether Plaintiffs' date of loss in in January 2016 or July 2017"). It is unclear to the Court why Plaintiffs believe there is an issue of material fact as to whether the date of loss occurred earlier under a different policy than the Policy at issue in this litigation.

Plaintiffs, there is no genuine issue of material fact as to whether Defendant AMCO one-year Contractual Limitations Provision applies to bar this breach of contract action. It does. *See Houtz*, 754 F. Supp. 3d at 597 ("One-year suit limitations provisions—such as the one at issue in this case—have repeatedly been found to be reasonable under Pennsylvania law.") (collecting cases). And Plaintiffs do not argue to the contrary. *See generally* (Doc. 47).

Even assuming *arguendo*, that the September 4, 2020, letter reaffirming the denial of the July 2017 claim gave rise to a new limitations period, Plaintiffs claim would still be untimely as it was not filed until November 5, 2021. *See* (Doc. 39-10 at 1) (reaffirming denial and stating the "the original denial of the claim still stands" and citing "no suit provision"); *see also Nehme v. Westfield Ins. Co.*, 2024 WL 3204461, at *4 (E.D. Pa. June 26, 2024) ("Even if Defendant's ongoing investigation tolled the enforcement of the one-year limitation clause, Plaintiff filed the instant suit on December 13, 2023, fifteen months after the claim was denied.").

The Policy contains an unambiguous, reasonable, and valid one-year Contractual Limitations Provision that has been repeatedly enforced by Courts in this Circuit and in Pennsylvania. The date of loss in this case was on July 28, 2017, and it is undisputed that Plaintiffs did not commence suit until over four years later—in November 2021. And Plaintiffs do not argue otherwise. Thus, absent waiver, the one-year Contractual Limitation Provision applies, and renders Plaintiffs' breach of contract claim untimely. Again, Plaintiffs

do not dispute that the one-year Contractual Limitations Provisions applies to this litigation, they only argue that Defendant's waived this provision.  (Doc. 47 at 7-10).

### B.    AMCO Did Not Waive the One-Year Contractual Limitations Period

 "Waiver is the voluntary and intentional abandonment or relinquishment of a known right." *Prime Medica Assoc.*, 970 A.2d at 1156.  "Waiver may be established by a party's express declaration or by a party's undisputed acts or language so inconsistent with a purpose to stand on the contract provision as to leave no opportunity for a reasonable inference to the contrary." *Id.* at 1157 (citation and quotation marks omitted).  "The insured must establish a factual basis to assert the defense of waiver or estoppel." *Id.* (collecting cases).  "The insured must present evidence establishing reasonable grounds for believing that the time limit would be extended or that the insurer would not strictly enforce the suit limitations period." *Id.* (citation and quotation marks omitted).

"While Pennsylvania courts have applied the principles of waiver and estoppel to suit limitation provisions, the use of waiver and estoppel has been limited to instances in which the insurer is responsible for the delay." *Williams v. Allstate Vehicle & Prop. Ins. Co.*, 2018 WL 4100681, at *6 (E.D. Pa. Aug. 27, 2018) (collecting cases).  "The determination of whether wavier or estoppel has occurred is a conclusion of law." *JN Realty Corp. v. Allied Ins. of Am.*, 2024 WL 4729471 at *4 (E.D. Pa. Nov. 8, 2024) (citations and quotations marks omitted).

Plaintiffs have failed to point to any record evidence from which a reasonable

factfinder could infer that AMCO waived the contractual limitations defense.[16]  *See Long*,

267 F. Supp. 3d at 535 ("Here, Farmers did nothing to cause the delay of this action.  It

invoked the suit limitations clause immediately upon receipt of the claim.  It reiterated its

reliance on the clause in the correspondence with Mr. Long.  It pleaded the defense in its

Answer to the Complaint.  Finally, it premises this motion on the suit limitations clause.

Thus, Farmers has not waived this defense."); *see also Houtz*, 754 F. Supp. 3d at 597-98)

("Again, the Court finds that State Farm's continued adjustment of the Houtzes' claim past

the one-year mark does not constitute waiver nor estoppel, especially considering that State

Farm informed the Houtzes of the applicable suit limitations provisions as early as August

12, 2021—one month after the date of loss."); *Colbert v. Allstate Prop. & Cas. Ins. Co.*, 2021

WL 5216782, at *8 (M.D. Pa. Aug. 16, 2021) ("Plaintiffs argue that Allstate's requests for

additional information and its reconsideration of its initial denial of coverage are the basis for

waiver.  But neither of these actions shown an express declaration of waiver or are so

inconsistent with the purpose of the limitation period as to leave no reasonable inference

---

[16]    Plaintiffs did not and do not argue that AMCO is equitably estopped from relying on the one-year Contractual Limitations Provision.  Rather, their sole argument is that AMCO waived the contractual limitations period by conduct. (Doc. 47 at 7-10).  Accordingly, the Court does not address whether Defendant AMCO is equitably estopped from enforcing the one-year Contractual Limitations Provision, but notes that such argument would likely fail. *See Prime Medica Assoc.*, 970 A.2d at 1157 ("The party asserting estoppel bears the burden of establishing estoppel by clear, precise, and unequivocal evidence.").  Nor do Plaintiffs claim that the discovery rule should apply to make their claims timely.  Moreover, there are neither allegations nor evidence that Plaintiffs ever requested a waiver of the limitation period or sought an extension of time to file suit. *Williams*, 2018 WL 4100681, at *8.

other than waiver.  Plaintiffs alleges no actions or statements by Allstate that would

reasonably serve as a waiver of the contractual limitations period."), *report and*

*recommendation adopted*, 2021 WL 4227067 (Mannion, J); *Williams*, 2018 WL 4100681, at

*7 ("Defendant never made any statement to Plaintiff that it would not rely on the suit

limitations provision, nor did it show any intention through conduct that it would not enforce

the provision."); *Swan Caterers, Inc. v. Nationwide Mut. Fire Ins. Co.*, 2012 WL 5508371, at

*5 (E.D. Pa. Nov. 13, 2012) ("Here, Swan Caterers has not presented any evidence to

support its claim of waiver or estoppel.  Nationwide never made any statement to Swan

Caterers that it would not rely upon the suit limitations provisions, nor did it show any

intention through its conduct that it would not enforce the provision.  Following the first

investigation on February 8, 2010, Nationwide denied Swan Caterers' claim for property

damage on February 9, 2010.  Although Nationwide performed subsequent investigations

after A Plus Roofing's initial assessment—all at the behest of Swan Caterers—the process

of investigation in determining liability by an insurer does not constitute a waiver by the

insurer.") (internal citation and quotation marks omitted).  The same logic applies here and

compels the conclusion that AMCO did not waive the one-year Contractual Limitations

Provisions.

    In addition, the one-year Contractual Limitations Provisions was clearly stated in the

Policy, the denial letter, and letter reaffirming denial and Plaintiffs "had an obligation to read"

the Policy.  *Swan Caterers*, 2012 WL 5508371, at *5 (citations omitted).  And although

AMCO is "under no obligation to remind policyholders of the suit limitation clause contained within the insurance policy," *id.*, AMCO repeatedly reminded Plaintiffs of the one-year Contractual Limitations Provision.  (Doc. 39-7; Doc. 39-10).  Further the August 9, 2017 denial letter contained the following language:  "We expressly reserve all other rights, defenses, of contentions, which are available to us under the policy of insurance, by law or otherwise, and do not waive any such rights or defenses which we now have or which may become known to us in the future."  (Doc. 39-7 at 2).

Plaintiffs' reliance on their Exhibit B, (Doc. 47-3), does not raise a genuine issue of material fact as to whether AMCO waived the one-year Contractual Limitations Provision through its conduct.[17]  *See Pratts*, 2019 WL 1952875, at *7 ("Plaintiff does not point to any action by Defendant that it would not enforce the limitation provision, so her waiver defense fails.  For one, Defendant's conduct that occurred after the expiration of the period established by the limitations provision cannot be said to have waived that clause.") (collecting cases).  No reasonable factfinder could infer that Defendant's agent conduct in April of 2021 (returning Plaintiffs' telephone call inquiring on the 2017 claim and verbally reaffirming denial) amounted to a waiver of the one-year Contractual Limitations Provision.  Nor have Plaintiffs identified any actions or conduct by Defendant AMCO that could constitute a waiver, as the initial denial letter unambiguously provides that AMCO "expressly

---

[17]    Plaintiffs' Exhibit B, (Doc. 47-3), is the same exhibit as Defendant's Exhibit F, (Doc 39-6).  Both appear to be AMCO's claim file notes regarding Plaintiffs' claim.

reserves all other rights, defenses, of contentions, which are available to us under the policy of insurance, by law or otherwise, and do not waive any such rights or defenses which we now have or which may become known to us in the future." (Doc. 39-7 at 2); *see also Swan Caterers*, 2012 WL 5508371, at *5 (noting that Nationwide inclusion of this language in the initial denial letter "illustrates that Nationwide never intended to waive any provision in the policy, including the suit limitation clause."). And AMCO's process of investigation in determining liability cannot reasonably constitute a waiver. *See Nehme*, 2024 WL 3204461, at *3 ("Plaintiff argues that Defendant's review of additional evidence substantiates their waiver defense. The process of investigation in determining liability by an insurer does not constitute a waiver by the insurer. . . . An ongoing examination of the evidence does not illustrate Defendant's intention to waive their right to exercise the suit limitations clause.") (internal citation and quotation marks omitted).

Plaintiffs have failed to identify any facts from which a reasonable factfinder could infer that Defendant AMCO waived the one-year Contractual Limitations Provision, either expressly or by conduct. *See, e.g., Prime Medica Assoc.*, 970 A.2d at 1158 ("Insured failed to show any actions by Insurer which induced Insured to conclude Insurer would waive the limitations period."); *JN Realty Corp.*, 2024 WL 4729471, at *6 ("JN Realty has also presented no evidence to support a finding that Allied Insurance unfairly delayed addressing the claim submitted by JN Realty during the one-year suit limitation periods, that Allied Insurance misled JN Realty about the possibility of an approval of JN Realty's claim, or that

Allied Insurance induced JN Realty to refrain from commencing suit.  In addition, JN Realty presents no evidence showing any actions, words, representations, or promises indicating that Allied Insurance intended to waive or extend the suit limitation provision.  In the absence of any such evidence, JN Realty has not and cannot meet its burden with respect to either waiver or estoppel."); *Nelson v. State Farm Fire & Cas. Co.*, 665 F. Supp. 3d 708, 719 (W.D. Pa. 2023) ("Further, any assertion that State Farm waived the suit limitation provision or should be estopped from asserting the same is belied by the record in this matter.  State Farm sent several letters to Plaintiff identifying a date of loss of April 3, 2018, indicating that State Farm had not determined whether her claim was covered at that point, and further quoting the Policy's suit limitations provisions.  Clearly, State Farm is no way conveyed a voluntary and intentional abandonment or relinquishment of the suit limitations provisions.  Similarly, the Court finds that Plaintiff has not come forward with sufficient evidence that could establish that Plaintiff had reasonable grounds for believing that the time limit for filing suit would be extended or that State Farm would not strictly enforce the suit limitation provision. "), *aff'd* 2024 WL 1132765 (3d Cir. Mar. 15, 2024).  Again, the same logic applies here and cannot satisfy Plaintiffs burden to show that AMCO waived the one-year Contractual Limitations Period.

The two cases relied upon by Plaintiffs to support their waiver argument do not help.[18]  In *General State Authority v. Planet Insurance Company*, the Pennsylvania Supreme Court affirmed the Commonwealth Court's judgment finding that the plaintiff's claim was barred by the limitations period and stating that "[t]he law is clear that such a clause, setting time limits upon commencement of suits to recover on a policy, is valid and will be sustained." *Id.* at 165.  While the Court did briefly address the possibility of waiver and estoppel, it found neither situation applied in that case.  Similarly, in *Jones v. Harleysville Mut. Ins. Co.*, 900 A.2d 855, 857, the Pennsylvania Superior Court upheld the limitations period and concluded that Defendant had not waived the limitations period.  Moreover, that case concerned alleged criminal conduct by the insured which is not at issue here and therefore is inapposite.

As there is no dispute that the date of Plaintiffs loss was July 28, 2017 (if not earlier), and they did not commence this litigation until November 5, 2021, the one-year Contractual Limitations Provisions precludes Plaintiffs' breach of contract claim.  Moreover, even assuming *arguendo*, that the limitations period was somehow renewed by the September 4, 2020, letter reaffirming denial of the July 28, 2017, claim, Plaintiffs suit would still be untimely.  Accordingly, the Court finds that Plaintiff failed to establish any basis for waiver and thus Plaintiffs' breach of contract claim is time-barred.  Defendant AMCO is entitled to

---

[18]       *Gen. State Auth. v. Planet Ins. Co.*, 346 A.2d 265, 266 n.6. (Pa. 1975) and *Jones v. Harleysville Mut. Ins. Co.*, 900 A.2d 855, 857 (Pa. Super. 2006).

summary judgment as a matter of law on its affirmative defense of the one-year Contractual

Limitations Provision.  Because the Court is granting summary to Defendant's on the one-

year Contractual Limitations Provisions, it need not address the additional argument of

whether Defendant is entitled to summary judgment on the basis of the Policy Exclusions.

###    C.    <u>Leave to Amend</u>

Finally, in one sentence at the conclusion of their brief in opposition to Defendant's

motion for summary judgment, Plaintiffs state "[i]n the alternative, Plaintiffs requests leave to

amend their complaint to cure any perceived deficiencies."  (Doc. 47 at 13).  Initially, the

Court notes that Plaintiffs failed to file any motion or request for leave seeking to amend

their complaint.  Fed. R. Civ. P. 15(a)(2); *see Ramsgate Court Townhome Ass'n v. West

Chester Borough*, 313 F.3d 157, 161 (3d Cir. 2002) (plaintiff "concluded its brief in

opposition to the motion to dismiss with this sentence:  'However, in the event that the Court

concludes that the Complaint fails to state claims upon which relief may be granted,

Plaintiffs and the Waste Removal Class respectfully request that they be granted leave to

amend the Complaint.'  That is the only mention of amending [Plaintiff] ever made before

the district court.  [Plaintiff] never filed a motion to amend, nor did it provide the district court

with a proposed amended complaint.  As a consequence, the court had nothing upon which

to exercise its discretion.").  Moreover, the Court granted Plaintiffs leave to file a second

amended complaint on July 28, 2023, after it adopted Magistrate Judge's Carlson Report

and Recommendation and dismissed certain claims without prejudice.  (Doc. 27).  For

whatever reason, Plaintiffs chose not to file a second amended complaint and stood on the First Amended Complaint.

Rule 15 directs that courts "should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). Courts find that "leave to amend must generally be granted unless equitable considerations render it otherwise unjust." *Holden v. Homesite Ins. Co.*, 2020 WL 2079402, at *3 (E.D. Pa. Apr. 30, 2020) (internal citation and quotation marks omitted). "Grounds that may warrant denial of leave to amend include undue delay, bad faith, dilatory motive, prejudice, and futility." *Id*. The Court finds it would be inequitable to allow Plaintiffs leave to amend at this late stage of the proceeding.

Justice does not require granting Plaintiffs leave to amend the First Amended Complaint. Initially, amendment would be futile because Plaintiffs breach of contract claim is clearly time-barred for the reasons set forth in this opinion and it unclear how an unknown amendment would change that conclusion. Moreover, Plaintiffs had the chance to file a second amended complaint by August 11, 2023, and for whatever reasons chose not to file a second amended complaint. (Doc. 27). And Plaintiffs waited nearly two years to request leave to amend (and did so in a single line at the conclusion of their brief filed in opposition to Defendant's motion for summary judgment). (Doc. 47 at 13).

There is no formal motion or request for leave to file a second amended complaint, nor did Plaintiffs submit a proposed complaint that would, as Plaintiffs put it, "cure any perceived deficiencies." (*Id.*); *see In re Allergan ERISA Litig.*, 975 F.3d 348, 357 (3d Cir.

2020) ("Despite the flaws pointed out by the defendants in the motion to dismiss and associated briefing, the plaintiffs gave no hint as to how they would further amended their complaint.  In light of that, we cannot say the District Court abused its discretion in denying leave to amend."); (*Id.* at 358) ("We do not ask district courts to be mind readers but have instead recognized repeatedly that a district court does not abuse its discretion by denying leave to amend when the party seeking leave does not attach a draft amended complaint to its request.") (collecting cases); *accord LabMD*, *Inc. v. Boback*, 47 F.4th 164, 192-93 (3d Cir. 2022).

The Court further finds Plaintiffs unduly delayed in seeking leave to amend and that Defendant AMCO would be prejudiced by permitting an unknown amendment at this late stage of the litigation, where discovery has been completed (after the Court granted an extension of time to complete discovery) and dispositive motions have been filed and this case has been pending for over three years.  *See Fraser v. Nationwide Mut. Ins. Co.*, 352 F.3d 107, 116 (3d Cir. 2003) (district court did not abuse its discretion in denying leave to amend where plaintiff "sought leave to file a third amended complaint to state these two additional causes of action at the eleventh hour—the day before his opposition to Nationwide's summary judgment was due.").  Moreover, Plaintiffs did not request leave before dispositive motions were filed and first sought leave in their opposition brief, after discovery was closed and dispositive motions had been filed.  For the foregoing reasons,

the Court will not grant Plaintiffs leave to amend to "cure any perceived deficiencies"

because leave to amend would be both futile and inequitable.

## V.    CONCLUSION

While the Court sympathizes with the Plaintiffs, it is duty bound to apply the law.  For the

foregoing reasons, Defendant AMCO's motion for summary judgment will be granted.  A

separate Order follows.

_____
Robert D. Mariani
United States District Judge